**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION**

Johnny Lopez,                                   :          Case No. 1:10-CV-02822

      Plaintiff,                              :

v.                                              :          Magistrate Judge Vernelis K.
                                                           Armstrong

Commissioner of Social Security,                :          **MEMORANDUM OPINION AND
                                                           ORDER**

      Defendant.                              :

      The parties to this action have consented to have the undersigned Magistrate enter judgment

in this case pursuant to 28 U.S.C. § 636 (c) and Fed.R.Civ.P. 73. Plaintiff seeks judicial review,

pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), of Defendant's final determination

denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act

(Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI

of the Act, 42 U. S. C. §§ 1381 et seq.  Pending are the parties' briefs on the merits (Docket Nos.

16 & 23).  For the reasons that follow, the Commissioner's decision is Affirmed..

**I. Procedural Background**

      On November 2, 2005, Plaintiff Johnny Lopez protectively filed applications for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging a period of disability

as of August 30, 2005.  (Tr. 104-08). On May, 31, 2006, the state agency denied Plaintiff's claims

initially, and on March 2, 2007,  upon reconsideration.  (Tr. 15, 66-71, 81-90).  On March 13, 2007,

Mr. Lopez filed a timely request for hearing.  (Tr. 15, 55)

Plaintiff's claim was assigned to Administrative Law Judge (ALJ) Stephen Hanekamp, and a hearing was held on November 21, 2008.  (Tr. 1160-81).  The hearing was attended by Mr. Lopez, his counsel, a Spanish interpreter, vocational expert Mr. Brett L. Salkin and an observer.

On January 28, 2009, ALJ Hanekamp issued a Notice of Decision - Unfavorable,  Plaintiff not disabled.  (Tr. 12-28).  Plaintiff appealed, but on October 19, 2010, the Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner.  (Tr. 1-3).

Mr. Lopez objected to the ALJ's decision as not supported by substantial evidence and premised on legal error and requested review by the Appeals Council.  (Tr. 10, 1000-1001).  However, the Appeals Council found no basis for review, leaving the ALJ's decision as the final decision of the Commissioner.  (Tr. 3).

On December 14, 2010, Plaintiff filed the Complaint presently before this Court seeking judicial review of the decision under 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Docket No. 1).

## II. Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832 -33 (6th Cir. 2006).

## III. Legal Issues

1. Whether the ALJ erred in failing to give appropriate weight to the opinion of Dr. Vazquez, Plaintiff's treating psychiatrist.

2.   Whether it was legal error for the Administration not to obtain IQ testing for the Plaintiff.

2

## IV. Factual Background and Medical History

### Plaintiff's History

Mr. Lopez was born on April 16, 1979 and was 29 years old at the time of hearing.   (Tr. 104).  Mr. Lopez is illiterate in English and his initial paperwork was completed by his mental health case manager, Jennifer Gonzalez.  (Tr. 119, 124, 135-142, 165).  Mr. Lopez also cannot read or count money and does not know how to pay bills.  (Tr. 139).  At the hearing, Mr. Lopez testified that he stopped going to school at age seven or eight.  (Tr. 1164).

Mr. Lopez has been employed in the past.  At Plaintiff's hearing V.E. Salkin testified that Plaintiff's past relevant work experience was as a fiberglass and parts cleaner (medium, unskilled) and as a heavy glass cleaner (heavy, unskilled).  (Tr. 143, 154, 195-196, 1178)

### Plaintiff's Medical History Including Treating Sources and Examining and Reviewing Sources

#### Physical Conditions

Plaintiff does not challenge the ALJ's findings regarding his physical impairments.  However, a brief summary of Plaintiff's physical health history follows.

On August 26, 2004, Plaintiff underwent left radical nephrectomy to treat a benign neoplasm.  (Tr. 21, 953-54).  In 2005, Plaintiff underwent an inguinal hernia repair.  (Tr. 21, 565).  In 2006, his left testicle was removed to treat a benign tumor.  (Tr. 21, 547).  On October 16, 2008, Plaintiff had mitral valve repair surgery to correct a perforation of the anterior leaflet that had caused moderate to severe mitral regurgitation.  (Tr. 21, 318-22).   One of Plaintiff's cardiologists stated that

Plaintiff's cardiac condition was Class II, and Plaintiff had slight, mild impairment of activity and would be comfortable with rest or with mild exertion.  (Tr. 21, 247).  Plaintiff has complained of chronic knee and back pain.  (Tr. 21, 505).  Plaintiff had wrist surgery for dynamic scapholunate dissociation.  (Tr. 22).  The ALJ determined that while the record established that Plaintiff has undergone several surgeries, the evidence did not show that he was disabled due to these surgeries for a period of twelve consecutive months.  (Tr. 21).

### Mental Conditions

### February, 2005

Plaintiff has a history of mental problems.  Mr. Lopez presented to his family practice physician on February 9, 2005 with complaints of depression, suicidal thoughts, anhedonia, fatigue, difficulty concentrating, poor sleep, impaired memory, increased appetite and anxiety.  (Tr. 854).  The Plaintiff was prescribed Zoloft and Ambien.  (Tr. 855).

### March through June, 2005

Mr. Lopez's first mental health contact was with Center For Family and Children Services' Mental Health Clinic and Bridgeway Mental Health Clinic (hereinafter "Bridgeway") from March 30, 2005, through June 27, 2005, where he was diagnosed with a major depressive disorder and post traumatic stress disorder and was assigned a global assessment  functioning score of 45.  (Tr. 674).  At that point he was depressed, suicidal, angry and nervous.  (Tr. 676).  Plaintiff's  primary mental health providers have been Dr. Eduardo Vazquez, a psychiatrist, Linda Cruz, a mental health clinician and Jennifer Gonzalez, CPST.

### November, 2005

4

In November 2005, Plaintiff's counselor at Bridgeway, who had been treating him since March 2005, noted that he was not following his treatment plan or keeping his doctor's appointments. (Tr. 763). She said that Plaintiff would be discharged from the program if he did not come to his next appointment. (Tr. 763). The following month, Plaintiff was discharged from Bridgeway after he failed to show up for his appointment. (Tr. 674-75). Plaintiff's counselor said that Plaintiff was aware that he needed treatment, but failed to participate. (Tr. 675).

### April, 2006, Dr. Vazquez, Plaintiff's Treating Psychiatrist

On April 21, 2006, Dr. Vazquez, Plaintiff's treating psychiatrist, prepared a summary for the Rehabilitation Services Commission. (Tr. 740-742). Dr. Vazquez noted that Mr. Lopez originally presented for treatment on August 18, 2005 with depression and suspiciousness. (Tr. 740-41). He later exhibited sadness, loneliness, isolation, loss of motivation, significant anxiety, insomnia, irritability and anger. His symptoms became more severe, and he started to hurt himself with a knife or burning of his skin and reported visual hallucinations. Plaintiff's treatment consisted of counseling sessions and prescription medication. (Tr. 740-42).

In Dr. Vazquez's opinion the treatment regime was not working. (Tr. 740). He said Plaintiff was still anxious, irritable and suspicious. (Tr. 741). He said Plaintiff had severe problems that prevented him from being able to function without the help of his grandparents. (Tr. 741). Dr. Vazquez noted that a number of medications had been tried without significant help and concluded that "At this time he is not able to function very much and he functions with the help of his grandparents that are helpful to him by preparing food and providing direction and socialization." (Tr. 741).

5

**May, 2006, Dr. House, Consultative Examining Psychologist**

The following month, on May 4, 2006, Plaintiff was evaluated by David V. House, Ph.D., at the request of the state agency. (Tr. 734-39).

Plaintiff told Dr. House that he did not remember when he was born, where or how long he worked at his past jobs or when he got married. (Tr. 737). Plaintiff could not perform serial seven subtraction or recall objects after five minutes. (Tr. 737). This led Dr. House to note that Plaintiff likely had low intellectual functioning. (Tr. 737).

Based on the information gathered during the interview and the testing, Dr. House concluded that Plaintiff's concentration and attention were moderately limited, his ability to understand and follow directions was mildly limited, his ability to withstand stress and pressure was moderately limited and his ability to relate to others, deal with the general public, adapting, insight and overall level of judgment were moderately limited. (Tr. 738). Dr. House diagnosed Plaintiff with a depressive disorder, panic disorder with agoraphobia and substance abuse in reported remission. (Tr. 738). Dr. House noted that further testing needed to be conducted to rule out Borderline Intellectual Functioning. (Tr. 738). He assessed Plaintiff with a Global Assessment Functioning (GAF) score of 48, which indicated serious symptoms . (Tr. 204).[1] Dr. House did not perform IQ testing, although he did not believe that Plaintiff's intellectual level was especially high and opined

_____

[1] The GAF scale reflects the "clinician's judgment" about an individual's psychological functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). A GAF score of 41-50, indicates that the individual has serious symptoms or a serious impairment in social, occupational, or school functioning. In most instances, ratings on the GAF Scale should be for the current period (i.e., at the time of evaluation). Id. at 33.

that he thought that an evaluator would be surprised if Plaintiff's IQ was in the low 70s.  (Tr. 738).

### May, 2006, Dr. Pawlarczyk, Consultative Reviewing Psychologist

Later that month, on May 22, 2006, Douglas Pawlarczyk, Ph.D, reviewed Plaintiff's file at the request of the state agency.[2]  (Tr. 715-32).

Dr. Pawlarczyk noted that Plaintiff was previously employed as a tattoo artist and a barber. (Tr. 732).  He also noted that Plaintiff lived alone, drove, took care of his dog, mowed the lawn and had no difficulties with self care.  (Tr. 731).  Although Plaintiff denied having visitors, Dr. House noted that Plaintiff's social worker indicated otherwise..  (Tr. 731).  Dr. Pawlarczyk agreed with Dr. House that Plaintiff had mild to moderate limitations in maintaining concentration, persistence, and pace, relating to others and adapting to changes.  (Tr. 732).  Dr. Pawlarczyk noted that from August 30, 2005, through May 19, 2006, Plaintiff suffered from: a depressive disorder, borderline intellectual functioning, panic disorder with agoraphobia, borderline personality disorder and substance abuse in reported remission; and that Plaintiff exhibited:  moderate limitations in activities of daily living, maintaining social functioning, concentration, persistence and pace.  (Tr. 715, 718-20, 722-23, 725).  Dr. Pawlarczyk concluded that Plaintiff retained the ability to perform simple,

---

[2]

Dr. Pawlarczyk's report does not indicate his credentials, however, Ohio's licensingwebsite notes that he is a licensed psychologist, with a PhD, who received his license in 1985. Ohio License Center: available at: https://license.ohio.gov/Lookup/SearchDetail.asp?ContactIdnt=2941745&DivisionIdnt=83&Type =L.

This Court confirmed Dr. Pawlarczyk's credentials by visiting the above referenced website on December 20, 2011.

repetitive tasks.  (Tr. 732).  He noted that Plaintiff's statements and presentation to Dr. House were markedly different from the rest of the evidence in the file.  (Tr. 732).  He concluded that Plaintiff was not credible.  (Tr. 732).

### 2007 through 2008, Dr. Vazquez, Ms Gonzalez, Case Manager and Ms. Cruz, Counselor

Throughout 2007 and 2008, Plaintiff regularly saw Dr. Vazquez and his case manager Jennifer A. Gonzalez.  Ms. Cruz and Ms. Gonzalez provided Mr. Lopez with significant emotional support and guidance throughout 2007 and 2008 concerning issues of child support and physical health.  In February 2007, Plaintiff told Ms. Gonzalez, that he was depressed because his ex-wife threatened to take his kids from his grandparents.  (Tr. 385).  During this time, Mr. Lopez complained of depression, fatigue, frustration, anxiety, flashbacks and feelings of worthlessness. (Tr. 227-231, 234, 237, 346-346A, 350-351, 354, 357, 366-372, 375-376, 380-381, 384-386).  Mr. Lopez saw Ms. Cruz on October 1, 2008 with feelings of depression, fatigue and panic.  (Tr. 226). He was having trouble sleeping and feared for his safety.

### February through August, 2007, Dr. Vazquez

On February 7, 2007, Dr. Vazquez noted that Mr. Lopez was experiencing paranoid thoughts and nightmares, which caused him to jump from his balcony and injure his wrist.  (Tr. 383).  On March 9, 2007, Mr. Lopez presented to Dr. Vazquez with complaints of nightmares and feelings of sadness, withdrawal and lack of motivation.  (Tr.378).  In March and April, 2007 Dr. Vazquez noted that Plaintiff was tense and sad because he was having problems with his ex-wife.  (Tr. 377-78).  He noted that Plaintiff was not suicidal or homicidal.  (Tr. 377-78).   Dr. Vazquez reported that Mr. Lopez was tense, sad, and had a restricted affect. Dr. Vazquez adjusted Plaintiff's medications on

April 12, 2007 and June 22, 2007.  (Tr.373, 377).  Dr. Vazquez saw Mr. Lopez on May 17, 2007.

During this session, the Plaintiff described a violent outburst in response to a verbal insult.  (Tr.

374).  In May and June, 2007, Dr. Vazquez noted that Plaintiff was sad, but that he was sleeping

better on the anti-depressant medication.  (Tr. 373-74).  On August 6, 2007, Mr. Lopez spoke with

Dr. Vazquez about his nightmares, visual hallucinations and belief in demons.  (Tr.  364).  In

August, Plaintiff told Dr. Vazquez that he was still having nightmares, but that he was spending

more time with his grandfather.  (Tr. 364).

### April, 2007, Dr. Jedlicka

On April 4, 2007, Dr. Jedlicka, Mr. Lopez's physical medicine and rehabilitation physician,

reported that Mr. Lopez had a severe, overlying psychological pathology for which  he was treated

by Dr. Vazquez and Ms Gonzalez and was prescribed Trazadone, Lamictal and Seroquel. (Tr.

548-549).  On July 26, 2007, Dr. Jedlicka reported that a functional capacity evaluation indicated

that light duty was appropriate, but she suspected a psychiatric disability.  (Tr. 490).

### September, 2007, Ms Gonzalez

Plaintiff was scheduled to see Dr. Vazquez in September 2007, but he cancelled his

appointment. (Tr. 363).  He did, however, see Ms. Gonzalez.  (Tr. 366).  Plaintiff told Ms. Gonzalez

that he was anxious and nervous about attending his upcoming custody hearing.  (Tr. 366).  He

discussed his plans for the future, and Ms. Gonzalez noted that his insight was good.  (Tr. 366).  At

his appointment with Ms. Gonzalez, Plaintiff complained that he was anxious and depressed about

his financial situation.  (Tr. 368).  However, he said he had recently gone fishing with his

grandfather.  (Tr. 368).  Ms. Gonzalez noted that his insight was good.  (Tr. 368).

### October through December, 2007, Dr. Vazquez

October 11, 2007, Plaintiff saw Dr. Vazquez and Ms. Gonzalez.  (Tr. 361, 362).  Plaintiff told Dr. Vazquez that he still having fear of people and visual hallucinations at night when he was in and out of sleep, but that he had a better insight into them.  (Tr. 361).  Dr. Vazquez noted that Plaintiff was more relaxed, now that the weather had cooled down and there were fewer people on the streets (Tr. 361). Dr. Vazquez advised him to return in four weeks.  (Tr. 361).  At his appointment with Ms. Gonzalez, Plaintiff said he was calm and feeling better.  (Tr. 362).

In November and December 2007, Plaintiff missed several appointments (Tr. 358, 358A, 360). Dr. Vazquez noted that he was a "no show." (Tr. 358, 358A, 360).

### January, 2008, Ms. Gonzalez

In January, 2008, Plaintiff returned to Ms. Gonzalez. He told her that he missed his appointments because he was sick. (Tr. 357).  He said he was frustrated with his medical treatment and financial situation, but that he was getting a lot of support from his grandparents.  (Tr. 357).  He said he was trying to get custody of his two eldest children, but that he was concerned that his ex-wife would show up and he would not be granted custody.  (Tr. 357).  Later that day, he saw Dr. Vazquez.  (Tr. 356).  Dr. Vazquez noted that Plaintiff was alert, but that his affect was dull, his thinking was superficial and he was worried.  (Tr. 356).  He continued Plaintiff on medication.  (Tr. 356).

### February through June, 2008, Dr. Vazquez

In February, 2008, Plaintiff told Dr. Vazquez that he was having financial problems and was concerned about his upcoming custody hearing.  (Tr. 355).  On examination, Dr. Vazquez noted that

Plaintiff's affect was dull, but that he was alert, pleasant and his thinking was relevant.  (Tr. 355).

Dr. Vazquez completed a medical source statement about Plaintiff's ability to perform basic mental

activities on a sustained basis.  (Tr. 391-92).  On February 7, 2008, Dr. Vazquez reported that Mr.

Lopez had not improved despite counseling appointments and medication adjustments.  (Tr. 391)

Dr. Vazquez noted that Plaintiff continued to be withdrawn with poor motivation, low energy and

increased anxiety and anxiety about his physical problems.  (Tr. 391).  Dr. Vazquez opined that Mr.

Lopez has poor or no ability to use judgment, make occupational adjustments, function

intellectually, make personal and social adjustments, maintain attention and concentration for two

hour segments, respond appropriately to routine changes, maintain regular attendance and be

punctual, deal with the public, relate to co-workers, interact with supervisors, function independently

without special supervision, deal with work stresses, complete a normal workday and work week,

understand, remember and carry out complex, detailed or simple job instructions, socialize, behave

in an emotionally stable manner and relate predictably in social situations.  (Tr. 391-392).

Plaintiff was scheduled to see Dr. Vazquez and Ms. Gonzalez in March and April 2008, but

he cancelled his appointments.  (Tr. 239-42).

In June 2008, Plaintiff had a follow-up appointment with Dr. Vazquez.  (Tr. 348).  He told

Dr. Vazquez that he had gotten custody of his two older children and went on a three-week trip to

New York.  (Tr. 348).  However, he said he did not go out of the house much the entire time he was

on vacation.  (Tr. 348A).  He told Dr. Vazquez that he had moved in with his girlfriend.  (Tr. 348).

Dr. Vazquez noted that Plaintiff was alert, pleasant and that he did not complain of depression or

psychosis.  (Tr. 348).  Later that month, Plaintiff was transferred to a new mental health case worker.

11

(Tr. 237-38).  He expressed some concern over the transfer, but, by the end of the session, he was talking to Ms. Cruz about his medical condition and said he felt better after having "vented" to her. (Tr. 237).

### July, 2008, Dr. Vazquez and Ms Cruz

In July, 2008, Plaintiff complained that he was anxious and overwhelmed with his child support issues. (Tr. 234).  He said he was thankful that he had the support of his girlfriend and that they "help[ed] each other overcome [their] anxiety and depression." (Tr. 234).  In August, Ms. Cruz discussed Plaintiff's treatment plan. (Tr. 231).  She noted that Plaintiff had made progress in dealing with his anxiety. (Tr. 231).  Plaintiff told Ms. Cruz that he engaged in outdoor activities, such as fishing, and that he believed it helped calm him down. (Tr. 231).  In September, Plaintiff said he was still having financial problems. (Tr. 227, 228), but he reported that he was less depressed. (Tr. 228).  He told Ms. Cruz that taking care of his children full-time helped him cope with his symptoms. (Tr. 227).  He told Dr. Vazquez that he enjoyed fishing with his grandfather. (Tr. 232). Dr. Vazquez noted that Plaintiff was tolerating the medication well, so he increased his dosage. (T. 232).  He advised Plaintiff to return in six weeks. (Tr. 232).

### October 2008, Ms Cruz

In October 2008, Plaintiff had a follow-up appointment with Ms. Cruz. (Tr. 226).  He said he was panicky, depressed, tired and worried about his safety. (Tr. 226).  He was mostly concerned with an upcoming surgery. (Tr. 226).  However, he said he felt confident in his surgeon. (Tr. 226). He said he was getting a lot of moral support from his grandparents and girlfriend. (Tr. 226).  Later that month, he had a follow-up appointment with Ms. Cruz. (Tr. 224).  He was anxious about his

12

upcoming child support hearing, but he agreed to participate in a worker's intervention program, which focused on coping skills.  (Tr. 224).

### November, 2008, Dr. Vazquez

In November, 2008, Dr. Vazquez completed another medical source statement. (Tr. 222-23). On November 5, 2008, Dr. Vazquez reported that Mr. Lopez had been under his care for major depression with psychosis since August 18, 2005.  (Tr. 222).  The doctor stated that Plaintiff had undergone counseling and had used many medications, but Mr. Lopez obtained only poor control of his condition with continued hallucination, poor motivation, withdrawal and aggression with minor irritation. (Tr. 222).  Dr.Vazquez concluded that Mr. Lopez had little to no ability to make occupational adjustments, function intellectually or make personal and social adjustments. had poor or no ability to maintain attention and concentration for two hour segments, respond appropriately to routine changes, maintain regular attendance and be punctual, deal with the public, relate to co-workers, interact with supervisors, function independently without special supervision, work in coordination or in proximity to others, deal with work stresses, complete a normal workday and work week, understand, remember and carry out complex or detailed job instructions, socialize, behave in an emotionally stable manner, and relate predictably  in social situations.  (Tr. 222-223).

### Hearing Testimony

Plaintiff appeared, with counsel, and testified through a Spanish-English interpreter. Tr. 1162-73).  Plaintiff was 29 years of age, at the time of the hearing.  (Tr.1164).  He lived with his girlfriend and two of his minor children.  (Tr.1165).  Plaintiff said he had not worked in four years.  (Tr.1167).  He had previously worked at a factory cleaning fiberglass, but he stopped when

he got laid off.  (Tr.1167).  After that, he worked at an insurance company cleaning glass.  (Tr. 1168).  He claimed that he stopped working at that job after his kidney burst.  (Tr.1168).  Plaintiff said he could not work because he was depressed.  (Tr.1169).  He said he could not stay still and was always thinking and sweating.  (Tr.1172).  He also said he was moody and that he had trouble sleeping.  (Tr.1173).  He took several medications, but he testified that they did not cause side effects.  (Tr.1172).

In a typical day, Plaintiff watched television and fished with his grandfather (Tr. 1170. When it was not cold outside, he went to church.  (Tr.1170).  He got along with his girlfriend and children.  (Tr.1170).

Brett Salkin testified as a vocational expert. Mr. Salkin testified that an individual with Plaintiff's vocational characteristics and limitations could perform unskilled, light jobs, such as housekeeper (246,000 nationally), assembly line worker (844,000 nationally) and inspector (192,000 nationally).  (Tr.1178-79).

## V. Analytical Overview: Determining Disability

District Court review of Commissioner of Social Security disability determinations is, essentially, appellate in nature, and is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards. Colvin v. Barnhart , supra, 475 F.3d 727, 729 (6th Cir. 2007.

The "substantial evidence" component of judicial review requires that the Court determine that the Commissioner's decision is based on "more than a scintilla of evidence but less than a preponderance; [and that] it is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

Moreover, because district court  review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from  making credibility determinations. Id.  Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that decision is supported by substantial evidence, even if the court were inclined to have decided the case differently.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999).  Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side.  Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988).  Furthermore, the decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion.  Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability."  Colvin, supra, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

15

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

> Step 1: Determine whether applicant is  engaged in "substantial gainful activity" at the time benefits are being sought.  If yes,  the applicant is not disabled. If no, then move to step 2.[3]

> Step 2: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe."  If there is no finding of a "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[4]

> Step 3: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[5]

> Step 4: Determine if the applicant retains sufficient "residual functional capacity"[6]        to allow for the performance of his past, relevant work .  If  the applicant

---

[3]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[4] Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. .  20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[5]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926..

[6]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e)

possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability.  If not, move to step 5.[7]

Step 5: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity and consistent with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled.[8]

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),.  Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## VI. ALJ Findings of Fact and Conclusions of Law

---

and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applciant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[7] Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[8] The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.   20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)

.

On January 28, 2009, after consideration of the entire record, and in accordance with the five step sequential analysis, the ALJ made the following findings of fact and conclusions of law after the final hearing held on November 21, 2008:

1. Mr. Lopez meets the insured status requirements of the Social Security Act through December 31, 2009.

2. Mr. Lopez has not engaged in substantial gainful activity since August 30, 2005, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. Mr. Lopez has the following severe impairments: status post nephrectomy due to benign neoplasm of kidney (Exhibit F, pp. 46-47, 69 and 187-90) [Tr. 953-54, 931, 809-12], mononeuritis, not otherwise specified (Exhibit F, pp. 432, 456 and 478) [Tr. 564, 543, 520], testicle removal due to cancer (Exhibit F, pp. 202-10) [Tr. 789-97], lumbar disc protrusion at L4-5 since June 11, 2007 (Exhibit F, pp. 496 and 506) [Tr. 502, 492], status post mitral valve repair on October 16, 2008 (Exhibit F, pp. 676-80) [Tr. 318-22], dynamic scapholunate disassociation (Exhibit F, pp. 660 and 673) [Tr. 338, 325], hypertension (Exhibit F, pp. 193-229) [Tr. 770-806], migraine headaches (Exhibit F, pp. 123-129) [Tr. 870-76], anemia (Exhibit F, p. 432) [Tr. 567], possible fibromyalgia (Exhibit F, p. 506) [Tr. 492], and depression (Exhibit F, pp. 231-55, 260-65, and 299-327) [Tr. 744-68, 734-39, 672-700] (20 CFR 404.1521 et seq. and 416.921 et seq.).

4. Mr. Lopez does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, I find that Mr. Lopez has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with restrictions. Specifically, Mr. Lopez [can] lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for a total of six hours of an eight-hour day and sit for a total of six hours of an eight-hour day. He cannot work in an environment with concentrated exposure to pulmonary irritants or prolonged exposure to temperature extremes. Mr. Lopez is limited to simple, routine tasks with no more than superficial interaction with co-workers, supervisors and the general public. Mr. Lopez can speak little or no English; therefore, contact with the general public would be limited to Spanish speaking only.

18

.

6.     Mr. Lopez is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     Mr. Lopez was born on April 16, 1979 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     Mr. Lopez has a marginal education and is unable to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue in this case because Mr. Lopez's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering Mr. Lopez's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Mr. Lopez can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.    Mr. Lopez has not been under a disability, as defined in the Social Security Act, from August 30, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-28)

## VII. Standard of Review

The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  McClanahan v. Comm'r of Soc.  474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence.  Id. (citing 42 U.S.C. § 405(g )).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir.

1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Id. (citing Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore, the reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)).

## VIII.  Discussion

### Plaintiff's Issue No. 1:  Whether the ALJ erred in failing to give appropriate weight to the opinion of Dr. Vazquez, Plaintiff's treating psychiatrist.

Plaintiff argues that the ALJ disregarded the appropriate standards for assessing the opinions of Plaintiff's treating physician Dr. Vazquez, a psychiatrist.  (Plaintiff's Brief on the Merits, Docket No. 16, 11).

Plaintiff notes that his treating psychiatrist has observed that Plaintiff was treated with a variety of medications as well as counseling, but, of these therapies,  none resulted in Plaintiff's condition significantly improving, and Plaintiff was not able to function very much and his grandparents help him.  (Plaintiff's Brief on the Merits, Docket No. 16, 9).   (Tr. 222, 741).  Dr. Vazquez noted that Plaintiff suffered from hallucinations, was poorly motivated, withdrawn and aggressive. (Plaintiff's Brief on the Merits, Docket No.16, 9).   (Tr. 222, 741).  Dr. Vazquez opined that Plaintiff had poor or no ability to: maintain attention and concentrate for two hour

20

segments, respond appropriately to routine changes, maintain regular attendance, be punctual, deal with the public, relate to co-workers, interact with supervisors, function independently without special supervision, work in coordination with or in proximity to others deal with work stresses, complete a normal work day or work week, understand, remember and carry out complex or detailed instructions, socialize, behave in an emotionally stable manner, or relate predictably in social situations.  (Plaintiff's Brief on the Merits, Docket No. 16, 9).  (Tr. 222-23, 391-92).

### The Treating Physician Rule

Analysis of Issue No. 1 turns on determining whether the ALJ addressed the opinions and evidence provided by  Plaintiff's treating physicians, specifically the opinions of Dr. Vazquez, in accordance with the so-called "treating physician rule."

The treating physician rule imposes requirements on the manner in which the Commissioner both entertains and gives expression to the opinions of a claimant's treating physician.  First, the Commissioner shall accord treating physician opinions appropriate deference consistent with the record evidence, and, second, the decisions and determinations that the Commissioner issues  must articulate, with appropriate specificity, the Commissioner's reasons for his handling of  treating physician opinions.

### Treating Physician Opinion Accorded Deference

20 C.F.R. § 404.1527(d)(2) provides in pertinent part,

> If we find that a treating source's opinions on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

21

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  Vance v. SSA, 260 F. App'x 801, 804 (6th Cir. 2008), Warner v. SSA, 375 F.3d 387, 390 (6th Cir. 2004).  The most emphatic application of this rule is that where a treating physician's opinion is uncontradicted such opinion is entitled to complete deference. Howard v. SSA, 276 F.3d 235, 240 (6th Cir. 2002), Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).

Where evidence does not warrant a treating physician's opinions being given controlling weight, treating physician opinions must nonetheless be evaluated in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(i) and (ii), which list such factors as duration of physician patient treatment relationship, number and frequency of examinations, nature and extent of the treatment relationship, and others.

A treating physician's opinions may be deficient.  See, Vance, supra, 260 F. App'x 801, 805 (physician's area of treatment differs from about which physician opined); Gaskin v. Comm'r of Soc. Sec., 280 F. App'x 472, 474-75 (6th Cir. 2008) (physician's opinion conflicts with his treatment notes); Hamblin v. Apfel, 7 F. App'x 449, 451 (6th Cir. 2001) (treating physician's opinion was five years old).

Also, treating physician opinions are limited.  Thus, a treating physician's opinions on issues such as whether the claimant is disabled or claimant's residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); accord Warner v. Commissioner of Social Security, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is

22

ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted). As an interpretive rule "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 416.927(d)(4).

### Decisions must articulate, with specificity, rationale for weight accorded Treating Physician Opinions

Where a treating physician opinion is <u>not</u> given controlling weight the Commissioner shall "give good reasons in [the] notice of determination or decision for the weight" accorded to such opinion. 20 C.F.R. § 404.1527(d)(2). <u>See</u>, <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004).

In his decisions the Commissioner must articulate his reasons for the weight given an applicant's treating source's opinions. <u>Id</u>. When denying benefits the Commissioners decisions shall

> contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

<u>Id</u>., <u>citing</u>. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5.

<u>See</u>, <u>also</u>, <u>Rogers v. Commissioner of Social Security</u>, 486 F.3d 234, 242 (6th Cir. 2007).

The <u>Wilson</u> Court explained the two-fold purpose behind this procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

Wilson, 378 F.3d at 544.

Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." Rogers, supra, 486 F.3d 234, 243.  See also Blakley v. Comm'r of Soc. Sec., 581 F.3d 399 (6th Cir. 2009) (Sixth Circuit reversed decision of District Court upholding ALJ decision of nondisability and remanded to the Commissioner).[9]

Notwithstanding the deference generally accorded treating physician opinions, the Sixth Circuit has consistently stated that "[the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).

---

[9]  In Blakley. supra, the Sixth Circuit found that ALJ had not satisfied the requirements of the treating physician rule because the the of the ALJ's incomplete weighing of treating sources was not an excusable de minimis procedural violation   The Court also noted that it was unable to engage in meaningful review of the ALJ's decision because the ALJ's reasoning was not sufficiently specific to make clear that the ALJ recognized and evaluated the treating relationships of claimant's treating physicians, because the Court could not discern whether ALJ recognized that one of claimant's treating physician treated claimant for a significant period of time after injury and was not merely a consulting source, because there was no evidence in the record that any of the recommendations of the treating sources were so patently deficient that the Commissioner could not possibly credit them, and because claimant's numerous x-rays, CT scans, and MRIs presented objective  findings that were, at the very least, not inconsistent with his treating physicians' opinions.

The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers, supra, 486 F.3d at 242 (citation omitted).   If it is well-supported, then it will be given controlling weight.   If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." Id.  There is an additional requirement associated with the treating physician rule: "the ALJ must provide 'good reasons' for discounting treating physicians' opinions," and the reasons must be "sufficiently specific." Id.

Based on the foregoing discussion, the threshold consideration before this Court is whether, in rendering his decision, ALJ Hanekamp correctly applied the law, i.e., the treating physician rule, to the evidence, i.e. the opinions of Plaintiff's treating physicians, specifically Dr. Vazquez, and whether he appropriately articulated same in his January 28, 2009 decision.

In the current case ALJ Hanekamp engaged in a detailed review and discussion of both Dr. Vazquez's findings and opinions as well as the findings and opinions of other treating and non-treating sources to reach his conclusion regarding Plaintiff's mental condition and whether a findiing of disability was warranted.

As to those factors addressed by the ALJ that dissuaded him from regarding Dr. Vazquez's opinions as controlling, the ALJ noted the following:

1.  Plaintiff's mental impairment did not meet or medically equal the criteria of listing § 12.04.  (Tr. 18).

2.  Plaintiff did not meet the  "paragraph B" criteria of § 12.04, requiring a mental impairment to meet two of the following, (i) marked restriction of activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence or pace; (iv) repeated episodes of decompensation, each of extended duration.  (Tr. 18).

3.  Plaintiff had mild restriction in daily living.  Plaintiff can live alone, although family members assist him with cooking and household chores,  (Tr. 18, 135, 137, 185), although he could do some chores himself, e.g., mow the lawn.  (Tr. 18, 138).  Plaintiff was able to take care of his personal needs and care for his dog.  (Tr. 18, 136, 137).

4.  Plaintiff had moderate difficulties in social functioning, e.g. getting along with others. (Tr. 18, 204)  However, Plaintiff had maintained relationships with his grandparents and his girlfriend.  (Tr. 18, 232, 234).

5.  Reviewing State Agency psychological consultants opined that Plaintiff had no more than moderate difficulties in social functioning.  (Tr. 18, 715-32).

6.  There was no evidence of episodes of decompensation. (Tr. 18).

7.  Plaintiff did not meet the "paragraph C" criteria of  § 12.04, - requiring (i) episodes of decompensation, (ii) evidence that increase in mental demands or change in environment would cause decompensation; (iii) evidence of being unable to function outside of a highly supportive living arrangement.  (Tr. 18).

8.  Pertinent to Plaintiff's credibility, that Dr. Lynn Jedlicka, M.D. examined Plaintiff on June 1, 2007 for complaints of back and right knee pain, and Dr. Jedlicka noted that Plaintiff on earlier occasions had complained of left knee pain, and that he gave her a "very vague and sketchy" history.  (Tr. 21, 505).  Dr. Jedlicka also noted:

> I personally observed [Plaintiff] walking out of the hospital entrance approximately 1 week after his last visit on 4/4/07 without his cane, walking fluidly, not antalgic and comfortable appearing.  He was not aware that this was seen.  Today, he again presents with a cane.

(Tr. 21, 505).

9.  Also, as to credibility, Dr. Jedlicka reported that Plaintiff exhibited three of the five Waddell's signs of symptom exaggeration, and she stated that there was not much objective evidence supporting Plaintiff's complaints of back and knee pain.  (Tr. 22, 490).

10.  Dr. Vazquez's opinions were given less weight because they were not supported by the treatment notes and were inconsistent with the evidence as a whole.  (Tr. 23).

11.  Dr. Vazquez stated in a November, 2008, opinion that Plaintiff continued to have hallucinations.  However, in October, 2007, Dr. Vazquez reported in a treatment note that Plaintiff's hallucinations were actually occurring at night when he was in and out of sleep and he was gaining insight into those hallucinations.  (Tr. 23, 361).

12.  Dr. Vazquez's treatment notes indicated that Plaintiff had greater functioning than the doctor had indicated in his three opinions.  (Tr. 23).

13.  Dr. Vazquez's treatment notes indicated that Plaintiff was able to gain custody of his two older children, travel to New York, go fishing with his grandfather and maintian a relationship with a girlfriend that became serious enough that they moved in together.  (Tr. 23).

14.  Plaintiff's case manager, Ms. Gonzalez, and counselor, Ms. Cruz, also opined that Plaintiff has greater functioning than Dr. Vazquez states.  (Tr. 23).

15..  In July, 2008 counselor Cruz noted that Plaintiff was unavailable for his appointments with her because Plaintiff often accompanied his girlfriend or grandparents to their doctors' appointments.  (Tr. 23, 234).

16.  Case manager Gonzalez and counselor Cruz both noted that Plaintiff had met with his attorney and was in court on a number of occasions regarding child support and custody matters from August, 2007, through October, 2008.  (Tr. 23, 227, 234, 307, 366, 367).

17.  Plaintiff had anxiety regarding the court proceedings and requested that either Ms. Gonzalez or Ms. Cruz accompany him to court.  Plaintiff was nonetheless able to attend and participate in the proceedings, and there was no evidence of episodes of decompensation.  (Tr. 23).

18.  Dr. David V. House performed a psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination (BDD) on May 4, 2006.  (Tr. 23-24, 734-39). Dr. House observed or opined on various matters regarding Plaintiff.  (Tr. 24).

19.  Some weight was given to Dr. House's opinions regarding Plaintiff's functioning, but it was noted that Plaintiff's presentation at the evaluation with Dr. House was unique.  (Tr. 24).

20.  When Plaintiff sought mental health treatment at Bridgeway, contrary to statements made by Plaintiff during his evaluation by Dr. House, he was able to give an account of his childhood, the number of his siblings, his marriages and divorces, his education and his work history.  (Tr. 24, 744-52).

21.  Dr. Vazquez stated in April, 2006, a month after Dr. House's evaluation, that Plaintiff's recent and remote memory were normal.  (Tr. 24, 741).

22.  Evidence indicated that Plaintiff presented himself at Dr. House's evaluation as if he were functioning at a lower level than he actually was.  (Tr. 24).

23.  Douglas Pawlarczyk, Ph.D. reviewed Plaintiff's case file for the BDD on May 22, 2006.  (Tr. 24, 707-13).  He opined that Plaintiff retained the capacity for simple, routine tasks and moderate limitations on his ability to relate to others.  (Tr. 24, 707-13).

24.  Dr. Pawlarczyk also opined that Plaintiff's presentation at Dr. House's evaluation was "markedly different" that at other examinations.  (Tr. 24, 707-13).

25.  Dr. Pawlarczyk's opinion was consistent with the evidence and is given full weight. (Tr. 24).

26.  Evidence of inconsistencies in statements, symptom exaggeration, noncompliance and Plaintiff's vague testimony at the November, 2008, hearing undermined the credibility of his claims.  (Tr. 24).

27.  Plaintiff testified at the hearing that he had a second grade education  However, in April, 2005, during an initial mental health assessment, Plaintiff stated that he had a sixth grade education and had been placed in special education.  (Tr. 24, 678, 699, 746, 767).  On May 4, 2006, Plaintiff told Dr. House that he had a third grade education.  (Tr. 24-25, 735).  In electronically submitted statements provided in connection with his disability application Plaintiff reported that he had obtained a GED in 2003 and had additional training in a bakery in 1999.  (Tr. 25, 161, 206).

28.  Plaintiff stated at the hearing that his girlfriend wanted him to get a GED and helped him obtain it by doing all of the studying, classes and test-taking.  (Tr. 25, 1174-75).

29.  Plaintiff stated at the hearing that he had not driven in a year because he had fallen asleep a the wheel, possibly due to side effects of medications or maybe other causes, and that was the last time he drove.(Tr. 25, 1170-71, 1172).  However, Plaintiff told Ms. Gonzalez in June, 2007, that his driver's license had been suspended due to failure to pay child support.  (Tr. 25, 375).

30.  Plaintiff was not forthcoming at the November, 2008, hearing.  (Tr. 25).  He stated he was unable to recall much about his work history, and his testimony was vague regarding his impairments, symptoms and capabilities and vague, generally, to the majority of questions posed to him.  (Tr. 25, 1164-73, 1175-77).

31.  In March, 2006, Ms. Gonzalez reported that Plaintiff was able to live alone, care for a dog, care for his personal needs, perform some household chores, mow the lawn, drive and shop with his grandmother.  (Tr. 25-26, 135-38).

32.  In September, 2007, Plaintiff told Ms. Gonzalez that he was exercising in an effort to keep his weight in check.  (Tr. 26, 366).

As noted, it is not within the prerogative of the reviewing court in Social Security cases to balance evidence or otherwise engage in a de novo review of the facts of the case. The court asks and resolves two questions: was there substantial evidence to support the Commissioner's decision and was the Commissioner's decision based on correct interpretation of applicable  law. Colvin, supra, 475 F.3d 727, 729; Cutlip, supra, 25 F.3d 284, 286;. Her, supra, 203 F.3d 388, 389-90; Listenbee, supra, 846 F.2d 345, 349; Smith, supra, 99 F.3d 780, 781-82.

The above referenced interpretive framework is no different where the court is called upon to evaluate an applicant's claim of error arising out of an assertion that an ALJ erred in failing to apply or in applying improperly the treating physician rule when evaluating the record opinions of a claimant's treating physician.

In cases where the Commissioner did not accord controlling weight to the opinions of the claimant's treating sources, the essential consideration driving the court's inquiry is whether the ALJ provided specific reasons for the weight given to the treating source's medical opinion, whether such opinions were supported by the evidence in the case record, and whether the ALJ's articulation of his reasons was sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.  Vance, supra, 260 F. App'x 801, 804; Warner, supra, 375 F.3d 387, 390.

In the current case this Court's review of the record, especially the ALJ's hearing decision of 28, 2009 (in particular, the various points listed, above) shows that there was substantial evidence for the ALJ's decision; the ALJ had reviewed closely the evidence and

opinions offered by Plaintiff's treating sources, especially Dr. Vazquez; the ALJ provided a sufficiently detailed expression of his rationale for discounting the opinions of Dr. Vazquez, and that a subsequent reviewer would be able to assess the weight the ALJ gave to the treating source's opinions as well as the reasons for according those opinions the weight that he did.

Therefore, based on the foregoing, this Court finds, as to Plaintiff's Claim of Error No. 1, that the ALJ's evaluation of the opinions of treating physician, Dr. Vazquez, was not in error and that there was substantial evidence in the record to support the ALJ's decision regarding the opinions of treating physician Vazquez and, ultimately, for finding Plaintiff disabled.

### Plaintiff's Issue No.2.  Whether it was legal error for the Administration not to obtain IQ testing for the Plaintiff

Plaintiff argues that the ALJ should have obtained an IQ evaluation of Plaintiff before making a disability determination in this case.  (Plaintiff's Brief on the Merits, Docket No. 16, 12-15).  Specifically, Plaintiff asserts that record evidence raises the issue of Plaintiff's intellectual functioning and, therefore, greater inquiry should have been conducted into Plaintiff's IQ to determine whether application of listing section 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 was warranted.

Plaintiff argument rests on the general proposition that the courts are responsible for assuring that federal agency decisions are grounded in considerations of reasonableness and fairness.  Sayers v. Gardner, 380 F.2d 940, 943 (6th Cir. 1967).  In this light, despite the fact that a claimant may have been represented by counsel, the ALJ bears an independent responsibility to obtain evidence critical to a proper determination of a case.  Thorne v. Califano, 607 F.2d 218, 219-20 (6th Cir. 1970).  The ALJ has the duty to develop a full and fair record.   Lashley v.

30

Secretary of Health and Human Service, 708 F.2d 1048 (6th Cir. 1983).

Regarding Plaintiff's specific concern, that an IQ evaluation of Plaintiff' was necessary for a full and fair assessment of Plaintiff's disability claim, Plaintiff directs this Court's attention to what Plaintiff characterizes as "a series of discrepancies and concerns regarding [Plaintiff's] educational level and intellectual functioning." (Plaintiff's Brief on the Merits, Docket No. 16, 13). Plaintiff notes that the record indicates that his education took place in Puerto Rico, and no educational records of his Puerto Rico schooling were available to the SSA or counsel. (Tr. 25-26). Plaintiff had marginal education and was illiterate in English. (Tr. 25-26). Plaintiff noted that Dr. House, a consultant examiner for the SSA, stated that he did not believe that Plaintiff's intellectual functioning was especially high and opined that "[i]f his IQ is in the low 70s, the evaluator would be surprised." (Plaintiff's Brief on the Merits, Docket No.16, 13). (Tr. 738). Plaintiff also stated that Dr. Pawlarczyk identified listing § 12.05 and borderline intellectual functioning as a severe impairment. (Plaintiff's Brief on the Merits, Docket No.16, 13-14). (Tr. 715). Plaintiff argued that, by not ordering an IQ evaluation, the ALJ disregarded information indicative of additional intellectual deficits. (Plaintiff's Brief on the Merits, Docket No.16, 14).

The regulations do no mandate that an ALJ obtain a consultative review but grant the ALJ the authority to order a consultative examination where the record does not contain sufficient information to enable the ALJ to make a disability determination. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990), Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 214 (6th Cir. 1984).

20 C.F.R. § 416.919(b) lists various considerations that may be reviewed in deciding whether a consultative evaluation shall be ordered: (1) additional evidence not in the record is

needed; (2) evidence that may have been available from medical sources but cannot be obtained due to death or lack of cooperation; (3) technical or specialized evidence not available from existing medical sources; (4) need to resolve conflict, inconsistency, ambiguity or insufficiency in the evidence by means other than using existing medical sources; (5) change in condition.

The question presently be for this Court, then, is whether the record indicators of Plaintiff's intellectual functioning are sufficiently tenuous as to require a formal assessment of Plaintiff's intellectual capability.  Stated otherwise, the question is whether there is such evidence in the record that suggests that Plaintiff is so intellectually challenged that it raises the specter of mental retardation with sufficient emphasis that would incline this Court to order the Commissioner to obtain an IQ examination of Plaintiff.

Of interest in this regard is that neither the matter of Plaintiff**'s IQ** nor the issue of whether Plaintiff should undergo a consultative IQ examination were ever raised at the hearing conducted on November 21, 2008.

Regarding his early education in Puerto Rico Plaintiff recounted that his sporadic attendance and frequent withdrawals from school were incident to, in Plaintiff's words "behavioral issues, problems with teachers, . . ." (Tr. 1164).  Plaintiff neither stated nor intimated that his problems with his early education experience in Puerto Rico were a function lack of intellectual capacity or understanding.

Plaintiff also noted that he had custody of his two eldest children, who were ages eleven and twelve at the time of the hearing.  (Tr. 1165).

Plaintiff had operated a motor vehicle in the past.  Plaintiff indicated at the hearing that he hadn't driven for approximately a year because he didn't feel that he was capable of driving at

32

that time.  (Tr. 1171).

The most substantive predicate in the record, suggesting the possibility that a consultative IQ examination might be warranted in this case is the statement by Dr. House, that Plaintiff's intellectual level doesn't seem to be especially high and that an evaluator might be surprised if Plaintiff's IQ were to test in the low 70s.

However, Dr. House ultimately assessed Plaintiff as having moderate limitations in concentration and attention,  mild limitations in understanding and following directions, and moderate limitations in dealing with the general public and in adaptability.  (Tr. 738).

Dr. Pawlarczyk, who conducted an evaluation of Plaintiff's record, opined that Plaintiff had borderline intellectual functioning.  (Tr. 719).

In their respective briefs neither Plaintiff nor Defendant stated whether an IQ evaluation had ever been conducted on Plaintiff.

Dr. Pawlarczyk's psychiatric review addressed § 12.05 mental retardation.  Dr. Pawlarczyk concluded that Plaintiff possessed a medically determinable impairment that did not precisely satisfy the § 12.05 criteria for mental retardation but did exhibit symptoms indicative of borderline intellectual functioning.  However, Dr. Pawlarczyk did not specifically identify the pertinent symptoms, signs or laboratory findings that substantiated the presence of this impairment in this sub-section of his report.  (Tr. 719).

Relevant to the considerations raised in Plaintiff's Issue No. 2, Dr. Pawlarczyk stated at the conclusion of his May 22, 2006, Psychiatric Review, in the section entitled Functional Capacity Assessment, that Plaintiff's statements and presentation were not consistent and, therefore, his statements "are not considered to be fully credible."  (Tr. 731).  Dr. Pawlarczyk

33

noted that the record indicated that Plaintiff presented at his consultative examination with severe memory deficiencies, e.g., claiming that he did not know his own birth date, how many siblings he had, why he left school, when he was married or divorced, or his own work history. (Tr. 731).  Dr Pawlarczyk also noted that at the consultative examination Plaintiff could not perform serial 7's, that he recalled zero of three objects, that he recalled three digits forward but zero in reverse.  (Tr. 731).

Dr. Pawlarczyk observed that the record indicated that Plaintiff presented much differently at his August, 2005, MSE and other exams.  (Tr. 731).  Dr. Pawlarczyk noted that, at the August, 2005, examination, Plaintiff was able to describe his childhood, and reported that he had three brothers and three sisters, Plaintiff stated that, back home in Puerto Rico,  he left school to work, that he left home at fifteen to get married and was then divorced at eighteen, which is when he came to the United States, that he then got married again and this marriage lasted about two years; and Plaintiff reported that he worked occasionally doing tattoos and cutting hair.  At that examination, Plaintiff's recent and remote memory were found to be within normal limits.  (Tr. 731).

Dr. Pawlarczyk observed that the record indicated that both Plaintiff's counselor and social worker noted no difficulties with self care, but that Plaintiff presented as unkempt when he went to his consultative examination.  (Tr. 731).

Dr. Pawlarczyk further noted that Plaintiff's ability to maintain concentration, persistence and pace were no more than moderately impaired, that tattooing and hair cutting would certainly require these abilities, and that Plaintff's ability to relate to others was no more than moderately impaired as Plaintiff had friends and got along well with his family.  (Tr. 732).

34

In evaluating an applicant's claim of disability under § 12.05 the Sixth Circuit has reiterated that it is the applicant's burden to prove that he meets or equals a listed impairment. Foster v. Halter, 279 F.3d 348, 352 (6th Cir. 2001).   In Foster the Sixth Circuit addressed the claim that the ALJ erred in rejecting her request for additional testing or expert testimony regarding her claim of mental impairment and mental retardation.

> Given that there was already sufficient testimony of Foster's impairments in the record for the ALJ to evaluate her mental condition and residual functional capacity, the ALJ did not abuse his discretion in denying Foster's requests for additional testing or expert testimony.  Although Foster focuses much of her argument on the ALJ's alleged misinterpretation of her IQ reports, there was substantial evidence in the record to support the district court's conclusion that Foster's impairments did not meet or equal the listing for mental retardation.  We therefore find no error in the district court's conclusion that the ALJ did not abuse his discretion in denying Foster's requests for additional testing or expert testimony.

Foster, supra, 279 F.3d 346, 356.

The predicate necessary to meet any of the § 12.05 listings for mental retardation is that the applicant has exhibited significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, where the evidence supports onset of the impairment before the age twenty-two with one of the four (A) through (D) listings of  § 12.05.[10]

The regulations governing Social Security claims specify that "[a]n ALJ has discretion to

---

[10]  The § 12.05 listings are: (A) mental incapacity evidenced by dependence upon others for personal needs, inability to follow instructions that precludes the use of standardized methods of measuring intellectual function; (B) verbal performance or IQ of 59 or less; (C) verbal performance or IQ of 60 through 70 and other physical or mental impairment imposing additional and significant limitation on work functionality; (D) verbal performance of 60 through 70.

35

determine whether further evidence, such as additional testing or expert testimony is necessary."
Foster, supra, 279 F.3d 348, 355.  (citing 20 C.F.R. § 416.917).

The ALJ has the responsibility to make an adequate inquiry into the issues before reaching a decision, 20 C.F.R. § 416.1444.  Articulating the parameters of this duty, the Sixth Circuit stated, "'[f]ull inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." Landsaw, 803 F.2d at 214 (citing Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977)) (emphasis in original).  This reasoning aptly applies to the instant case.

While this Court acknowledges that there are, throughout the record, conflicting perspectives on Plaintiff's intellectual functioning that give rise to some uncertainty regarding this matter, the Court also recognizes that the resolution of such uncertainties is within the province of the ALJ and not this Court.  Plaintiff's request for IQ testing does raise questions, but this Court is not convinced that Plaintiff's advocacy of this issue, or, more importantly, the record in this case, establishes that such an examination is necessary to the determination of disability.

Therefore, for the reasons set forth above, Plaintiff's second claim of error is denied and this Court finds that there was substantial evidence for the Commissioner to have made it's finding regarding the level of Plaintiff's intellectual functioning and non-disability.

## IX. Conclusion

The Court finds that the Commissioner's final decision is supported by substantial evidence in the record as a whole and must be affirmed.

36

Accordingly, the  final decision of the Commissioner is AFFIRMED; and the Plaintiff's

Statements of Error are DENIED and  this case is TERMINATED on the docket of this Court.


IT IS SO ORDERED.

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 30, 2011

37